UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------------x

In Re: New York City Policing During Summer 2020            No. 20 Civ. 8924
Demonstrations.


This filing relates to: *all cases*


----------------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINTS

GEORGIA M. PESTANA
ACTING CORPORATION COUNSEL OF THE CITY OF NEW YORK
*Attorney for Defendants*
100 Church Street
New York, New York 10007

By:     Brachah Goykadosh
        Elissa B. Jacobs
        Dara L. Weiss
        *Senior Counsels*
        Special Federal Litigation Division
        (212) 356-3523

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS .......................................................................................... ii

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT .............................................................................. 1

STATEMENT OF RELEVANT FACTS ................................................................ 2

ARGUMENT ........................................................................................................... 7

    I.   Plaintiffs Fail to Establish Subject Matter Jurisdiction Pursuant to Rule 12(b)(1)............. 7

        A.  Plaintiffs Do Not Have Standing to Pursue Any Claim for Injunctive Relief. ............. 7

        B.  Plaintiffs Do Not Have Standing to Pursue Any Claim for Declaratory Relief. .......... 9

        C.  Plaintiff State of New York Does Not Have Parens Patriae Standing........................ 10

        D.  Plaintiffs' Claims for Injunctive and Declaratory Relief Are Moot. .......................... 12

    II.  Plaintiffs Fail to State a Claim for Relief Pursuant to Rule 12(b)(6)............................... 13

        A.  Plaintiffs Fail to State a Claim for Municipal Liability. .............................................. 13

        B.  Plaintiffs' Claims against de Blasio, Shea, and Monahan are Redundant. ................. 22

        C.  Plaintiffs Fail to Plead Any Supervisory Liability Claim. .......................................... 22

    III. Qualified Immunity Shields Defendants from Liability. .................................................. 23

CONCLUSION....................................................................................................... 26

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aguirre v. City of New York*,
No. 15 Civ. 6043 (PKC), 2017 U.S. Dist. LEXIS 155422 (E.D.N.Y. Sep. 22, 2017) ...............................................................................................................................15

*Amnesty Am. v. Town of W. Hartford*,
361 F.3d 113 (2d Cir. 2004)..............................................................................................19

*An v. City of New York*,
230 F. Supp. 3d 224 (S.D.N.Y. 2017).............................................................................7, 9

*Aquino v. City of New York.*,
No. 16 Civ. 1577 (GHW), 2017 U.S. Dist. LEXIS 10436 (S.D.N.Y. Jan. 25, 2017) ...............................................................................................................................14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................................15

*Cash v. Cty. of Erie*,
654 F.3d 324 (2d Cir. 2011)...............................................................................................19

*City of Canton v. Harris*,
489 U.S. 378 (1989)...........................................................................................................14

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)............................................................................................................7, 9

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988)...........................................................................................................16

*Clear Channel Outdoor, Inc. v. City of New York*,
594 F.3d 94 (2d Cir. 2010).................................................................................................12

*Connick v. Thompson*,
563 U.S. 51 (2011)..............................................................................................................19

*Curtis v. New Haven*,
726 F.2d 65 (2d Cir. 1984)...................................................................................................8

*Davis v. City of New York*,
No. 12 Civ. 3297 (PGG), 2018 U.S. Dist. LEXIS 231116 (S.D.N.Y. Mar. 30, 2018) ...............................................................................................................................14

*Davis v. Stratton,*
    360 F. App'x 182 (2d Cir. 2010) ..............................................................................22

*DeShawn E. by Charlotte E. v. Safir,*
    156 F.3d 340 (2d Cir. 1998)......................................................................................8

*District of Columbia v. Wesby,*
    138 S. Ct. 577 (2018)...............................................................................................23

*Dwares v. City of New York,*
    985 F.2d 94 (2d Cir. 1993).......................................................................................22

*Floyd v. City of New York,*
    959 F.Supp. 2d 668 (S.D.N.Y. 2013)......................................................................12

*Geller v. Cuomo,*
    476 F. Supp. 3d 1 (S.D.N.Y. 2020).........................................................................24

*Geller v. De Blasio,*
    No. 20 Civ. 3566 (DLC), 2020 U.S. Dist. LEXIS 87405 (S.D.N.Y. May 18,
    2020) ........................................................................................................................24

*Graham v. Connor,*
    490 U.S. 386 (1989).................................................................................................17

*ICOS Vision Systems Corp., N.V. v. Scanner Technologies Corp.,*
    699 F. Supp. 2d 664 (S.D.N.Y. 2010) (Chin, J.)....................................................10

*Illinois v. City of Chicago,*
    137 F3d. 474 (7th Cir. 1998) ...................................................................................11

*Jacobson v. Commonwealth of Massachusetts,*
    197 U.S. 11 (1905)..............................................................................................24, 25

*Jenkins v. City of New York,*
    478 F.3d 76 (2d Cir. 2007).......................................................................................19

*Jones v. Town of East Haven,*
    691 F.3d 72 (2d Cir. 2012)..................................................................................16, 17

*L.A. County v. Humphries,*
    562 U.S. 29 (2010).....................................................................................................9

*Landers v. Police Officer Franks, et al.,*
    16-CV-5176 (PKC), ECF No. 86...............................................................................2

*Liberian Cmty. Ass'n of Conn. v. Lamont,*
    970 F.3d 174 (2d Cir. 2020).....................................................................................23

*Lucente v. Cty. of Suffolk*,
  980 F.3d 284 (2d Cir. 2020).............................................................................16

*Marcavage v. City of New York*,
  689 F.3d 98 (2d Cir. 2012)...........................................................................8, 10

*Matusick v. Erie Cty. Water Auth.*,
  757 F.3d 31 (2d Cir. 2014).............................................................................24

*Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*,
  397 F.3d 77 (2d Cir. 2005).............................................................................12

*McMillian v. Monroe Cty.*,
  520 U.S. 781 (1997).......................................................................................22

*Medina v. City of New York*,
  No. 19 Civ. 9412 (AJN), 2020 U.S. Dist. LEXIS 222887 (S.D.N.Y. Nov. 30,
  2020) ..............................................................................................................8

*Mhany Mgmt., Inc. v. Cty. of Nassau*,
  819 F.3d 581 (2d Cir. 2016)............................................................................12

*Monell v. Dep't of Soc. Servs.*,
  436 U.S. 658 (1978)............................................................................... *passim*

*Mullenix v. Luna*,
  136 S. Ct. 305 (2015)......................................................................................23

*Muschette v. Gionfriddo*,
  910 F.3d 65 (2d Cir. 2018)..............................................................................25

*Nat'l Union Fire Ins. Co. v. Int'l Wire Grp., Inc.*,
  No. 02 Civ. 10338 (SAS), 2003 U.S. Dist. LEXIS 9193 (S.D.N.Y. June 2,
  2003) ..............................................................................................................9

*New York v. Griepp*,
  2021 U.S. App. LEXIS 6942 (2d Cir. March 10, 2021) ......................................10

*New York v. Town of Wallkill*,
  No. 01 Civ. 0364 (CM), 2001 U.S. Dist. LEXIS 13364 (S.D.N.Y. Mar. 16,
  2001) ......................................................................................................8, 10, 11

*Nunez v. City of New York*,
  No. 11 Civ. 5845 (LTS) (JCF), 2015 U.S. Dist. LEXIS 176190 (SDNY July
  10, 2015) .........................................................................................................12

*O'Shea v. Littleton*,
  414 U.S. 488 (1974).........................................................................................7

*Pearson v. Callahan*,
    555 U.S. 223, 129 S. Ct. 808 (2009)........................................................................25

*Peck v. Baldwinsville Cent. Sch. Dist.*,
    351 F. App'x 477 (2d Cir. 2009) ...........................................................................10

*Pembaur v. City of Cincinnati*,
    475 U.S. 469 (1986)................................................................................................14

*Pennsylvania v. Porter*,
    659 F.2d 306 (3d Cir. 1981)...............................................................................10, 11

*Phillips v. Cty. of Orange*,
    894 F. Supp. 2d 345 (S.D.N.Y. 2012)....................................................................22

*Reynolds v. Giuliani*,
    506 F.3d 183 (2d Cir. 2007)...................................................................................19

*Roman Catholic Diocese v. Cuomo*,
    141 S. Ct. 63 (2020)..........................................................................................24, 25

*Russman v. Bd. of Educ.*,
    260 F.3d 114 (2d Cir. 2001)...................................................................................12

*S. Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020)...........................................................................................25

*Shain v. Ellison*,
    356 F.3d 211 (2d Cir. 2004)..............................................................................7, 8, 9

*Sorlucco v. N.Y.C. Police Dept*,
    971 F.2d 864 (2d Cir. 1992)...................................................................................16

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Cts. Ret. Plan v.*
    *Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013)...................................................................................15

*Strauss v. City of Chi.*,
    760 F.2d 765 (7th Cir. 1985) ...................................................................................4

*Tangreti v. Bachmann*,
    983 F.3d 609 (2d Cir. 2020)..............................................................................22, 23

*Tardif v. City of New York*,
    No. 19-1360, 2021 U.S. App. LEXIS 7877 (2d Cir. Mar. 18, 2021) ........................3

*Trustees of Indiana Univ. v. Curry*,
    918 F.3d. 537 (7th Cir. 2019) ................................................................................11

*Wagschal v. Skoufis*,
   442 F. Supp. 3d 612 (S.D.N.Y. 2020) (McMahon, J.)..........................................................12

*Wray v. City of New York*,
   490 F.3d 189 (2d Cir. 2007)..............................................................................................13

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017)......................................................................................................23

## PRELIMINARY STATEMENT

For nine days in New York City, unprecedented protests erupted in the midst of a global pandemic.  From May 28, 2020 to June 5, 2020, the police confronted huge, highly charged and emotional protests. Protesters directed their rage at the NYPD officers present at the protests. There were thousands of protesters—approximately 10,000 on one day alone—in various locations throughout the five boroughs of the City of New York. While many protests were peaceful, it is simply untrue that all protesters exercised their First Amendment rights in a safe and lawful manner. Some protests devolved to looting and rioting. Protestors set police cars ablaze; vandalized precinct houses; threw rocks, bricks, bottles at officers; stabbed, punched, bit officers; and hurled Molotov cocktails at officers, to name a few examples. A curfew was imposed in the City for the first time in nearly a century. Close to 400 NYPD personnel were injured. This was the crisis that exploded in the middle of the global pandemic crisis.

Now, plaintiffs sue the City of New York, Mayor Bill de Blasio, Commissioner Dermot Shea, Chief Terence Monahan and other members of service, seeking various forms of relief: injunctive, declaratory, compensatory. Plaintiffs say their constitutional rights were violated at protests. Plaintiffs want to hold the City and these high-ranking officials liable. They cannot.

Plaintiffs' allegations are replete with rhetoric but lacking in law.  They do not have standing to pursue their claims for injunctive and declaratory relief. The week of unprecedented protests has passed. The City of New York already has committed to implementing numerous changes to the NYPD, recommended in the wake of these unprecedented protests, and is also finalizing a Reform and Reinvention Plan, required by the State of New York of all localities receiving state funds.  Plaintiffs' claims for municipal liability are the type that the Supreme Court of the United States has called "tenuous." There is no way plaintiffs can plead that

defendants knew to "a moral certainty" that police officers would confront protests of this scale, of this magnitude, in the midst of a global pandemic.  Moreover, there is no history of unlawful policing at protests as plaintiffs suggest. In the past decade, in the Southern District of New York, there has been one liability finding against one officer resulting from policing a protest in New York City, with the jury awarding the grand sum of a penny.

This case is not about reforming the NYPD. To be sure, policing can always be improved. Reforms are already being implemented by NYPD itself in response to the unprecedented protests, and more will follow as a result of community input into the Reform and Reinvention Plan. Rather, plaintiffs here seek court orders granting injunctive and declaratory relief following the nine days of mass protests in the summer. They seek municipal liability. And of course, they seek attorneys fees. All should be denied and this motion should be granted in its entirety.

## STATEMENT OF RELEVANT FACTS

There is no history of unconstitutional policing at protests by NYPD. Though plaintiffs lament what they label as a history of aggressive policing at protests, these lamentations are without support. During the past decade, in the Southern District of New York,[1] there has only been a single finding of liability by a jury against a single inspector for his actions at an Occupy Wall Street protest.  *See Gersbacher v.  Winski*, No. 14 Civ. 7600 (GHW), ECF No. 201.[2] The jury awarded the protester one penny. *Id.* In four other Occupy Wall Street trials, juries returned

---

[1] In a case in EDNY, a jury found that a video-journalist had been falsely arrested while reporting on Black Lives Matter protest. *Landers v. Police Officer Franks, et al.*, 16-CV-5176 (PKC), ECF No. 86. The case was settled before the jury reached a damages determination.

[2] *See also* Priscilla DeGregory, *Occupy Wall Street Protester Gets One Penny in Excessive Force Case*, New York Post, January 9, 2018, https://nypost.com/2018/01/09/occupy-wall-street-protester-only-awarded-one-cent-in-suit/.

complete defense verdicts on various claims. *See Sherrad v. Redmond*, 15 Civ. 7318 (MB), ECF No. 123; *Soto v. Latalardo, et al.*, 13 Civ. 8474 (JPO), ECF No. 203; *Tardif v. City of New York*, 13 Civ. 4056 (KMW), ECF No. 353;[3] *Hessler v. Hall*, 13 Civ. 0821 (NRB), ECF No. 61. In the panoply of other cases cited to by plaintiffs, over the past decade, defendants almost always prevailed on motions to dismiss or summary judgment.[4] (*See People*, Am. Compl., ¶¶33, 34).

---

[3] Though the plaintiff in *Tardif* appealed, the Circuit recently affirmed the majority of the District Court's decisions. *See Tardif v. City of New York*, No. 19-1360, 2021 U.S. App. LEXIS 7877 (2d Cir. Mar. 18, 2021). The only issue the Second Circuit remanded was *a respondeat superior* claim against the City of New York premised on a purported assault and battery by an officer at a protest. A trial remains to be had on this very narrow issue. That is to say, no finding of liability on any of plaintiff's federal claims and her single state law claim will be determined.

[4] Footnotes 4 and 5 in the *People* Am. Compl. are misleading for this reason. Defendants parse through each case from the past decade cited, with the outcome, which *People* fail to include.

- *Tardif v. City of New York*, No. 13 Civ. 4056 (KMW): Full defense verdict; *see* footnote 3;
- *Brown v. City of New York*, No 13 Civ. 1018 (KBF): Summary judgment granted in defendants favor on qualified immunity ground, affirmed by the Second Circuit at 862 F.3d 182 (2d Cir. 2017);
- *Abujayyab v. City of New York*, No. 15 Civ. 10080 (NRB): Summary judgment granted in part, settlement;
- *Dekuyper v. City of New York*, No. 14 Civ. 8249 (DLC): Summary judgement granted in part (on *Monell* claim), settlement;
- *Marlin v. City of New York*, No. 15 Civ. 2235 (CM): Motion to dismiss granted in part and motion for qualified immunity denied, settlement;
- *Caravalho v. City of New York*, No. 13 Civ. 4174 (PKC): Summary judgment granted, affirmed by the Second Circuit at 732 F. App'x 18 (2d Cir. 2018); settlement for one plaintiff;
- *Pesola v. City of New York*, No. 15 Civ. 1917 (PKC): Summary judgment granted
- *Pluma v. City of New York*, No. 13 Civ. 2017 (LAP): Motion to dismiss granted, affirmed by the Second Circuit at 686 F. App'x 66 (2d Cir. 2017) (note: state law claims remanded);
- *Douglas v. City of New York*, No. 14 Civ. 8124 (ALC): Settlement;
- *Lynch v. City of New York*, No. 16 Civ. 7355 (LAP): Currently in discovery;
- *Landers v. City of New York*, No. 16-CV-5176 (PKC): *See* footnote 1;
- *Case, et al. v. City of New York*, No. 14 Civ. 9148 (AT): Summary judgment granted for all plaintiffs but one; trial scheduled for June 2021;
- *Higginbotham v. City of New York*, No. 14 Civ. 8549 (PKC): Summary judgment granted, affirmed by the Second Circuit at 741 F. App'x 28 (2d Cir. 2018);
- *Gersbacher v. City of New York*, No. 14 Civ. 7600 (GHW): Summary judgment granted in part; plaintiff's verdict against one inspector in the amount of one penny.

Although plaintiffs reference various lawsuits, they neglect to inform the Court about the dispositions, which were favorable to the defense.[5] Anyone can file a lawsuit.[6] Anyone can say what they want in that lawsuit. Just because lawsuits were filed does not mean there is a history of unconstitutional policing at protests, or even that violations occurred. Of course, some cases arising from protests were settled, but that is a normal part of litigation. No settlements contained an admission of liability. Plaintiffs cite to one liability finding from nearly 20 years ago, a case from the Republican National Convention. (*Payne*, Am. Compl., ¶94; *People*, Am. Compl., ¶28; *Sow*, Am. Compl., ¶429.) One case is not a history of unconstitutional policing.

To be sure, the recent past cannot be ignored. But it must be considered in context. The days following the tragic death of George Floyd by a Minneapolis police officer were challenging ones for the City. The pandemic ravaged its health and the economy.[7] "By summer, the frustrations of shutdowns and economic collapse had burst into the open. Shootings had doubled, and most of them were concentrated in the areas hardest hit by the coronavirus and unemployment."[8] No one could have predicted that a pandemic would rupture the City; no one

---

[5] In addition to the cases at footnote 4, as just a selection, the defense prevailed in the following cases: *Meyers v. City of New York*, 812 F. App'x 11 (2d Cir. 2020) (summary order); *Berg v. Kelly*, 897 F.3d 99 (2d Cir. 2018); *Wiles v. City of New York*, 724 F. App'x 52 (2d Cir. 2018); *Kass v. City of New Yor*, 864 F.3d 200 (2d Cir. 2017);  *Roper v. City of New York*, No. 15 Civ. 8899 (PAE),  2017 U.S. Dist. LEXIS 87561 (S.D.N.Y. June 7, 2017); *Pinto v. City of New York*, No. 15 Civ. 9696 (CM), 2017 U.S. Dist. LEXIS 219775 (S.D.N.Y. Mar. 2, 2017) *aff'd*  728 F. App'x 26 (2d Cir. 2018); *Mediavilla v. City of New York*, 259 F. Supp. 3d 82 (S.D.N.Y. 2016).

[6] *See Strauss v. City of Chi.*, 760 F.2d 765, 768-69 (7th Cir. 1985) (The "number of complaints filed, without more, indicates nothing. People may file a complaint for many reasons, or for no reason at all. That they filed complaints does not indicate that the policies . . . .  exist do in fact exist and did contribute to [plaintiff's] injury.")

[7]  *See*  Nelson D. Schwartz, *A City Ruptured*, N.Y. Times, March 9, 2021, https://www.nytimes.com/interactive/2021/03/09/business/economy/covid-nyc-economy.html.

[8] *Id.*

could have predicted that in a pandemic, protests would blow up; no one could have predicted that looters would run the streets, further puncturing an already ruptured City.[9]

And while many *protests* were peaceful, not all *protesters* were peaceful. Police cars were set ablaze; demonstration devolved into "jarring scenes of flaming debris, stampedes and looted storefronts."[10] Protesters prepared Molotov cocktails to hurl at the police—they were "swept up in the moment."[11] Protesters threw bricks at officers, [12] assaulted officers.[13]

   

---

[9]   *See   N.Y.C.   Protests   Turn   Violent*,   N.Y.   Times,   May   31,   2020), https://www.nytimes.com/2020/05/31/nyregion/nyc-protests-george-floyd.html.

[10] *Id.*

[11] Nicole Hong and William K. Rashbaum, *The 2 Lawyers, the Anti-Police Protests and the Molotov   Cocktail   Attack*,   N.Y.   Times,   June   7,   2020, https://www.nytimes.com/2020/06/07/nyregion/molotov-cocktail-lawyers-nyc.html;   *see   also* Azi Paybarah and Nikita Stewart, *Symbol of N.Y.C. Unrest: A Burning Police Car*, N.Y. Times, https://www.nytimes.com/2020/05/31/nyregion/police-cars-nyc-protests.html; *see also* Vincent Barone, *Woman who threw Molotov cocktail at NYPD car hit with federal charge*, N.Y. Post, May 31, 2020, https://nypost.com/2020/05/31/feds-charge-woman-who-threw-molotov-cocktail-at-nypd/.

[12]Thomas Tracy, *'So... my face is a brick magnet': NYPD lieutenant sports bloody face after violent   clashes   with   George   Floyd   protesters*,   N.Y.   Daily   News,   May   30,   2020, https://www.nydailynews.com/new-york/nyc-crime/ny-nypd-lieutenant-brick-magnet-george-floyd-protest-20200530-u7vqbkfjhvaltexkofidnrelgq-story.html.

[13] These photos are just a sampling.

Against this backdrop—the pandemic, the devolved demonstrations—for the first time in seventy-five years, a curfew was implemented. (*See* Ex. F, Exec. Order No. 117.) The imposition of the curfew was necessary "to protect the City and its residents from severe endangerment and harm to their health, safety and property"—the spreading of the virus and also the "demonstration activities [that] were subsequently escalated, by some persons, to include actions of assault, vandalism, property damage, and/or looting." *Id.* Despite the curfew, the protests carried on, as did the threat of violence. For instance, police seized hammers, lighter fluid, gas masks, and fireworks from protesters headed to the Mott Haven protests on June 4, 2020.[14] Even so, within days, peace was restored.[15] (*See* Ex. D, DOI Report at 22-23.) The protests continued but "without the confrontations between police and protesters that had happened in the previous week." (Ex D., DOI Report at 22.) The crisis—at least part of it—subsided.

That is the past. Turning to the present and looking to the future, imminent reform is underway. In response to the unprecedented protests and at the Governor's directive, the City of New York is revamping policing, including policing at protests. The Governor concluded that "urgent and immediate action is needed to eliminate racial inequities in policing, to modify and modernize policing strategies . . . and to develop practices to better address the particular needs of communities of color" and ordered the City to "shall ratify or adopt such plan by local law or resolution, as appropriate, no later than April 1, 2021." (*See* Ex. G, Exec. Order No. 203.)

The Mayor has submitted the first two (out of three) drafts with plans for reinventing the police. Also, as noted in the draft plans, the City directed the Department of Investigation and

---

[14] Craig McCarthy and Bruce Golding, *NYPD Commissioner Dermot Shea says Bronx protest was about 'mayhem,'* N.Y. Post, June 5, 2020, https://nypost.com/2020/06/05/nypd-commissioner-says-violent-nyc-protest-was-only-about-mayhem.

[15] *N.Y. Protesters Defy Curfew, but 10th Night of Marches Ends Peacefully*, N.Y. Times, June 6, 2020, https://www.nytimes.com/2020/06/06/nyregion/nyc-protests-george-floyd.html.

Office of Corporation Counsel to conduct independent reviews of the NYPD's response to protests from the summer. (Ex. B, Draft Plan 1 at 19.) The City accepted all 30 collective recommendations from both agencies. (Ex. B, Draft Plan 1 at 19.) The City is working to identify and assess structures of racism within NYPD. (Ex. C, Draft 2 at 15.) Following these unprecedented protests, the City has implemented (and is considering implementing) a plethora of actions, including drafting a new policy concerning First Amendment rights at protests and disorder control tactics; assessing existing training to develop new content related to protest, de-escalation, and crowd psychology.  (*See* Ex. A, Demonstration Response Tracker.) Policing is being reinvented, reimagined: improved.

## ARGUMENT

I.    **Plaintiffs Fail to Establish Subject Matter Jurisdiction Pursuant to Rule 12(b)(1).**[16]

  A. ***Plaintiffs Do Not Have Standing to Pursue Any Claim for Injunctive Relief.***

When seeking injunctive relief against a municipality, a plaintiff only has standing if they can "carry the burden of establishing that 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-102 (1983)). A plaintiff must show both "(1) a likelihood of future harm and (2) the existence of an official policy or its equivalent. A future harm is sufficiently likely if the injury or threat of injury is both real and immediate, not conjectural or hypothetical." *An v. City of New York*, 230 F. Supp. 3d 224, 228-29 (S.D.N.Y. 2017) (cleaned up). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974).

---

[16] Plaintiffs in *Payne*, *People*, and *Sow* seek injunctive and declaratory relief.  Plaintiffs in *Sierra* seek declaratory relief.

1. *Plaintiffs Fail to Show a Likelihood of Future Harm.*

To show a likelihood of future harm, plaintiffs cannot rely on past injury; they must show a likelihood that they will be injured in the future. *Shain*, 356, F.3d at 215 (quoting *DeShawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)). "The mere fact that such conduct brought the [plaintiffs] into conduct with the NYPD in a way that resulted in [an alleged constitutional violation] does not compel the conclusion that the [plaintiffs face] a real and imminent threat of reoccurrence." *Medina v. City of New York*, No. 19 Civ. 9412 (AJN), 2020 U.S. Dist. LEXIS 222887, at *17 (S.D.N.Y. Nov. 30, 2020). Any "subjective fear" by plaintiffs is "insufficient to state a basis for an injunctive in the absence of objective criteria indicating that the recurrence of the unlawful conduct is relatively likely to occur. *Id.* at *18 (citing *Lyon*s, 461 U.S. at 107 n.8). "The critical standing inquiry is whether a plaintiff is realistically threatened by a repetition of his experience." *Curtis v. New Haven*, 726 F.2d 65, 67 (2d Cir. 1984).

"For the ordinary individual litigant, this hurdle is exceedingly difficult to surmount." *New York v. Town of Wallkill*, No. 01 Civ. 0364 (CM), 2001 U.S. Dist. LEXIS 13364, at *19 (S.D.N.Y. Mar. 16, 2001). Here, plaintiffs fail to surmount that hurdle. There are no allegations that plaintiffs are threatened—realistically—by a repetition of their experiences. Any subjective fear does not bestow them with standing. The pandemic is (hopefully) receding, police reforms in response to the summer's protests are underway, and there is no prospect that another unprecedented crisis in a crisis will emerge; and if protests like those from the summer do explode, there is no prospect that any similar actions will be enacted or enforced. *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012).

Indeed, the unprecedented confrontations between protesters and police subsided by June 6, 2020, almost one year ago. (*See* Ex. D, DOI Report at 22-23.) Since then, many plaintiffs

continue to protest, without the extreme hostilities that existed during that week .[17] (*See Payne*, Am. Compl., ¶¶ 124, 137-142, 181, 201.) In fact, robust protests continue in the City of New York, without any of the summer's clashes, though plaintiffs allege otherwise, pointing to isolated incidents.[18] Plaintiffs allege no objective criteria indicating that the complained-of conduct will reoccur now. It has not. It will not. Any perceived threat is conjectural.

2.  *Plaintiffs Fail to Show the Existence of an Official Policy or Its Equivalent.*[19]

Defendants respectfully refer the Court *infra* to Point II.A of their motion.

**B.  *Plaintiffs Do Not Have Standing to Pursue Any Claim for Declaratory Relief.***

The "rule is clear: declaratory relief is intended to operate prospectively. There is no basis for declaratory relief where only past acts are involved." *Nat'l Union Fire Ins. Co. v. Int'l Wire Grp., Inc.*, No. 02 Civ. 10338 (SAS),  2003 U.S. Dist. LEXIS 9193, at *15 (S.D.N.Y. June 2, 2003); *L.A. County v. Humphries*, 562 U.S. 29, 31 (2010). To warrant declaratory relief, "[t]here must be a substantial controversy, between parties having adverse legal interests, of

---

[17] Though plaintiff Jarrett Payne claims that a police officer used excessive force and falsely arrested on January 18, 2021, he admits that he continues to protest.

[18] *See e.g.* Alex Taylor and Jesse O'Neill, Mayor de Blasio heckled during vigil to fight anti-Asian hate, N.Y. Post, March 19, 2021, https://nypost.com/2021/03/19/mayor-de-blasio-heckled-during-vigil-to-decry-anti-asian-hate/; Amanda Rosa, *Watch Protesters Close 2 N.Y.C. Bridges in Support of Essential Workers*, N.Y. Times, March 5, 2021, https://www.nytimes.com/interactive/2021/03/05/nyregion/nyc-labor-protest.html; Nate Schweber and Sean Piccoli, *Protesters in New York Urge Ouster of Trump and Pence*, N.Y. Times, January 7, 2021, https://www.nytimes.com/2021/01/07/us/politics/new-york-protests-trump.html ("Dozens of masked, uniformed police officers monitored the rally; no arrests were reported.").

[19] There is a split in the District Courts in this Circuit about if a "plaintiff establishes an official policy or its equivalent for purposes of standing under *Shain* and *Lyons* whenever that plaintiff shows an official policy or custom for purposes of stating a § 1983 claim for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)."*An*, 230 F. Supp. 3d  at 229, n.1. Defendants assume it does. Should plaintiffs' interpretation differ, defendants reserve the right to address any argument on reply.

sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *ICOS Vision Systems Corp., N.V. v. Scanner Technologies Corp.*, 699 F. Supp. 2d 664, 667 (S.D.N.Y. 2010) (Chin, J.); *Peck v. Baldwinsville Cent. Sch. Dist.*, 351 F. App'x 477, 479 (2d Cir. 2009) (citation omitted). Here, in all of the lawsuits, only past acts are involved. In particular, in *Sierra*, the Mott Haven protests were over in June 2020 and so there is absolutely no basis for declaratory relief in that case. (*Sierra*, Am. Compl., ¶10.) Moreover, as referenced *supra*, since the complained about actions at protests are not ongoing and have not occurred in many months, there is no basis for declaratory relief in any of the cases. *See Marcavage*, 689 F.3d at 103.

### C. *Plaintiff State of New York Does Not Have* **Parens Patriae** *Standing.*

For *parens patriae* standing, the State must satisfy the following requirements: "(1) injury to a sufficiently substantial segment of the state's population; (2) a quasi-sovereign interest; and (3) an inability for individual plaintiffs to obtain complete relief. *New York v. Griepp*, 2021 U.S. App. LEXIS 6942 (2d Cir. March 10, 2021). While the State alleged injury to protesters in the City from May 2020 to January 2021, the State cannot satisfy the other prongs.

Though the State has a quasi-sovereign interest to "uphold[] the rule of law and ensure that police agencies operate within the bounds of the law and do not violate the constitutional rights of citizens they are sworn to protect," *New York v. Town of Wallkill*, No. 01 Civ. 0364 (CM), 2001 U.S. Dist LEXIS 13364 at *9 (S.D.N.Y. March 16, 2001), the public record shows that the interest is misplaced here. This is because unlike the officials in *Wallkill* or those in *Pennsylvania v. Porter*, 659 F.2d 306 (3d Cir. 1981), Mayor de Blasio and Commissioner Shea have been responsive to complaints and issues raised by members of the public and other government officials.  Indeed, following the protests, the Mayor directed the Commissioner of the Department of Investigation and the Corporation Counsel to conduct reviews of the NYPD's

10

response to the protests and make recommendations. (*See* Ex H, Exec. Order No. 58; Ex. B, Draft 1, Ex C, Draft 2.) All of the recommendations resulting from those reviews have been accepted by the Mayor and the Police Commissioner and are in the process of implementation. (Ex. B, Draft 1 at 19, Item 7; *see also* Ex. A, Demonstration Response Tracker.)

Further, as the City is a subdivision of the State, the State legislature—not the Attorney General—has the authority to enact laws that impose requirements on its subdivisions. N.Y. Executive Law 75 (L2020, ch. 104) establishes a law enforcement misconduct investigative office, whose duty is to "review, study, audit, and make recommendations relating to the operations, polices, programs and practices" of local law enforcement agencies. And the State has used another tool—the power of the purse—to further its interest in improving policing across the state by requiring localities to submit police reform plans as a condition of receiving state funding. (Ex. H, Exec. Order No. 203.) This transparent, collaborative process engaged in by defendants resulted in a plan that builds on many reforms NYPD has undertaken. This is clear from the plan, which lays out initiatives undertaken between 2014 and 2020, and its appendices. (Ex. B, C, Drafts 1, 2.) Thus, the State's interest in improving policing and fostering trust is being furthered through means other than litigation. The interest, which was present in *Wallkill* and *Porter*, is not present here. Federal courts should be cautious about wading into a litigation brought by a State Attorney General against a city. *See Illinois v. City of Chicago*, 137 F3d. 474, 476 (7th Cir. 1998); *Trustees of Indiana Univ. v. Curry,* 918 F.3d. 537, 539 (7th Cir. 2019).

Moreover, the five cases consolidated with the State's, as well as six other cases[20] concerning the protests filed in the Southern and Eastern Districts of New York so far, make

---

[20] The other cases that have been filed so far are *Blake v. City of New York*, No. 21 Civ.  0188 (RA) (SDNY); *Boykin v. City of New York*, No. 21 Civ. 1362 (AJN) (SDNY); *Fraser v. City of New York, et al*., No. 20-cv-5741 (NGG) (EDNY); *Gelbard, et al. v. City of New York, et al*., 20-

plain that the State cannot satisfy the third requirement for *parens patriae* standing. While the other cases primarily seek money damages, at least two, *Payne* and *Sow,* seeks injunctive relief and the retention of jurisdiction until the "unlawful conditions" no longer exist.  Injunctive relief has been granted and monitors appointed in cases brought by private plaintiffs.  *See e.g. Floyd v. City of New York,* 959 F.Supp. 2d 668 (S.D.N.Y. 2013); *Nunez v. City of New York*, No. 11 Civ. 5845 (LTS) (JCF), 2015 U.S. Dist. LEXIS 176190, (SDNY July 10, 2015) (preliminarily approving consent judgment which includes appointment of independent monitor).

### D. *Plaintiffs' Claims for Injunctive and Declaratory Relief Are Moot.*

"[A]t all times, the dispute before the court must be real and live, not feigned, academic, or conjectural." *Wagschal v. Skoufis*, 442 F. Supp. 3d 612, 620 (S.D.N.Y. 2020) (McMahon, J.) (quoting *Russman v. Bd. of Educ.*, 260 F.3d 114, 118 (2d Cir. 2001)). "When the issues in dispute between the parties are no longer live, a case becomes moot." *Wagschal*, 442 F. Supp. at 620 (quoting *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 84 (2d Cir. 2005)). An action is moot if defendants "can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* at 620-21 (quotation omitted); *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 110 (2d Cir. 2010). Defendants bear a "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 621 (quoting *Mhany Mgtmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 603-04 (2d Cir. 2016)).

As plaintiffs themselves acknowledge, the issue is moot. (*People*, Am. Compl., ¶¶110.) Reform is underway. Both the Mayor and the Commissioner have stated that the NYPD will be

---

cv-3163 (MKB) (EDNY); *Jeffrey, et al. v. City of New York, et al.*, 20-cv-2843 (NGG) (EDNY) (class action); *Zayer v. City of New York, et al.*, 20-cv-6070 (ARR) (EDNY).

trained differently. (*People*, Am. Compl., ¶¶110.) Plaintiffs also acknowledge that NYPD instituted a new disorder control training after the protests had passed. (*People*, Am. Compl., ¶¶106-7; *Payne*, Am. Compl., ¶¶83-85.)

But beyond plaintiffs' own admissions, in response to the Governor's order, the City has been modifying and modernizing its policing strategies. (*See* Ex. H, Exec. Order No. 203.) The City has submitted the first two out of three drafts of its plans.  (Exs. B, C, Draft Plan 1, 2.) The last plan is due in days, on April 1, 2021. (Ex. G, Exec. Order No. 203.) In addition to that, after the protests, the City itself conducted two investigations into NYPD response to protests from this summer. (Ex. B, Draft Plan 1 at  19; Ex D, DOI Report, Ex. E, Corp. Counsel Report.) The City accepted all 30 collective recommendations. (Ex. B, Draft Plan 1 at 19.) Many actions have been implemented concerning policing at protests, and even more are being considered. (*See* Ex A, Demonstration Response Tracker.) There is no expectation the events of the summer will recur and the these reforms in response to the unprecedented protests will change policing in the City, eradicating the need for injunctive relief.

## II.   Plaintiffs Fail to State a Claim for Relief Pursuant to Rule 12(b)(6).

### A. *Plaintiffs Fail to State a Claim for Municipal Liability.*[21]

During the past decade, in the Southern District, there has been one liability finding against an officer for actions at a protest. Despite this, plaintiffs hurl claims at the City. Those claims fall flat. To state a municipal liability claim, plaintiffs must plead: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007).  To establish the "policy or custom" prong, a plaintiff must allege: the existence of (1) a formal policy, *see Monell v. Dep't of Soc.*

---

[21] Plaintiffs in all cases plead various theories of municipal liability.

*Servs.*, 436 U.S. 658, 690 (1978); (2) actions taken or decisions made by final municipal policymakers that caused a violation of plaintiff's rights, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-484 (1986); (3) a practice so persistent and widespread that it constitutes a "custom or usage" and implies the constructive knowledge of policymakers, *see Monell*, 436 U.S. at 690-91; or (4) a failure to properly train or supervise municipal employees that amounts to "deliberate indifference to the rights of those with whom municipal employees will come into contact," *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). *See Aquino v. City of New York.*, No. 16 Civ. 1577 (GHW), 2017 U.S. Dist. LEXIS 10436, at *8 (S.D.N.Y. Jan. 25, 2017). Plaintiffs pursue various theories of *Monell* and defendants address each theory in turn.

1. *No Unconstitutional Policies Have Been Admitted to by Defendants.*

Plaintiffs over-emphasize the significance of the DOI report and the Corporation Counsel report[22] to claims in their lawsuits. (*See e.g. Sow*, Am. Compl., ¶7.) Plaintiffs say, without any citation, that both these reports "acknowledge" and "admit" that the City has failed "to remedy these unconstitutional policies." (*Sow*, Am. Compl., ¶7.) Neither report contains any statement. The opposite is true. The Corporation Counsel report states: "[A]lthough the Law Department is counsel to the City, this report does not reach legal conclusions." That is, no unconstitutional policy has been admitted. An acknowledgement, at most, that policing at protests can be improved is not an admission of liability. Similarly, plaintiffs' reliance on other reports throughout their pleadings does not compel a finding of municipal liability. *See Davis v. City of New York*, No. 12 Civ. 3297 (PGG), 2018 U.S. Dist. LEXIS 231116, at *17 (S.D.N.Y. Mar. 30, 2018) (finding that the OIG Report does not demonstrate a pattern of excessive force and highlighting that the report stated that the number of substantiated CCRB force complaints was

---

[22] The DOI Report recognizes that "civil litigation can be a flawed mechanism for holding individual officers accountable." (Ex. D, DOI Report at 84.)

"modest") (citing cases); *Aguirre v. City of New York*, No. 15 Civ. 6043 (PKC), 2017 U.S. Dist. LEXIS 155422, at *15-16 (E.D.N.Y. Sep. 22, 2017) ("[P]laintiff's reliance on reports and articles regarding misconduct . . . are inadequate to allege a policy or custom of the City, let alone allege that that policy or custom is the one that gave rise to [p]laintiff's alleged violation.") (citations omitted). If citing to reports could create a virtual guarantee of liability, then there would be no need for any litigation at all. Plaintiffs cannot exploit these reports.

2.   *No Formal Policy Caused Plaintiffs to Be Subjected to the Denial of a Right.*

Plaintiffs allege no formal policy. At most, they raise their concerns about the Strategic Response Unit ("SRG"). (*See People*, Am. Compl., ¶¶85-96; *Payne*, Am. Compl., ¶¶63-64; (*Sow*, Am. Compl. ¶¶440-46.) Plaintiffs purport that the training that SRG officers receive "is almost certain to result in constitutional violations when applied to peaceful protesters." (*People*, Am. Compl., ¶90.) But "almost certain" does not make out a claim of constitutional dimensions. Even if it did, plaintiffs demand the Court accept a legal conclusion concocted by attorneys "couched" as a factual allegation. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Cts. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013). Moreover, the mere existence of SRG, in and of itself, does not cause the denial of a constitutional right. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief," the claim must be dismissed.") Thus, the mere existence of SRG cannot serve as the basis for liability.

3.   *No Practice So Persistent and Widespread to Establish* Monell *Liability Is Pointed to by Plaintiffs.*

To establish "*Monell* liability based upon a persistent and widespread" practice by a subordinate municipal employee . . . other than a policymaker, the employee's unconstitutional conduct must be so manifest as to imply the constructive acquiescence of senior policy-making

15

officials." *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 297-98 (2d Cir. 2020) (quoting *Sorlucco v. N.Y.C. Police Dept*, 971 F.2d 864, 870-71 (2d Cir. 1992) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988)). Even if there are "instances of reprehensible and at times illegal and unconstitutional conduct by individual officers . . . such a showing is not a sufficient basis for imposing liability on the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 82 (2d Cir. 2012). There must be "sufficient instances of *tolerant awareness* by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse." *Lucente*, 980 F.3d at 298 (quoting *Jones*, 691 F.3d at 82) (emphasis added).

   a.   Plaintiffs Fail to Point to a Practice of Excessive Force at Protests.[23]

The "isolated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom . . . that would justify municipal liability." *Jones*, 691 F.3d at 81 (citations omitted). Plaintiffs claim that the City has a practice of applying excessive force "in [a] myriad [of] ways" at protest. (*People*, Am. Compl., ¶¶115-119; *Payne*, Am. Compl., ¶¶87-89; *Wood*, Am. Compl., ¶¶43, 71, 216-226.[24]) Plaintiffs' purported practice encompasses—according to them—everything. Force relates to bikes, batons, pepper spray, body strikes, zip-ties, and tasers. (*People*, Am. Compl., ¶116; 30, 136, 143-45, 151, 158, 162, 166, 169 (batons and bikes); 185, 193, 198-99, 206, 208 (pepper spray); 216, 221, 225-26,

---

[23] Plaintiffs also complain about a practice of tight hand-cuffing; "kettling;" and dispersal orders at protests. (*See e.g. Sow*, Am. Compl., ¶¶469-476.) Indeed, plaintiffs in *Sow* provide a laundry list of failures to train allegations—the only plaintiffs to do so. (*See* Sow. Am. Compl., ¶438. (There are two paragraphs 438s in the Am. Compl, and the defense refers to the second.)) For clarity, defendants are moving on sub-parts (c), (d), (e), and (g). While defendants do not believe the other allegations are meritorious or will be able to survive a future motion, defendants do not move concerning those discrete issues herein.

[24] The Amended Complaint in *Wood* brings two separate claims for municipal liability premised on force at protests. (*See Wood*, Am. Compl., ¶¶216-226.) These claims subsume each other.

228, 233, 235, 242, 248-49 (shoving, punching)). Plaintiffs' allegations are broad. Defendants do not have a "tolerant awareness" of any and all uses of force at protests.

First, though plaintiffs include "tasers" in their litany, there are no facts supporting any excessive use of force involving tasers at protests. The word "taser" appears only in plaintiffs' list. The Court should not indulge this "everything but the kitchen sink" form of pleading.

Second, even if all of the instances of force that plaintiffs delineate form the basis for a violation,[25] plaintiffs cannot plausibly allege that any practice of excessive force was so persistent and widespread that it constitutes a custom and implies the "constructive knowledge" of the Mayor, Commissioner, and Chief of Department.[26] The Mayor, Commissioner, and Chief of Department did not order or ratify any use of excessive force, either expressly or tacitly. *Jones*, 691 F.3d at 81. They condemned it. Mayor de Blasio explicitly stated that while he approved broad strategies, he did not like everything he saw in the videos. (*People*, Am. Compl., ¶101.) He lauded "restraint" and not violence. (*Payne*, Am. Compl., ¶56.) Commissioner Shea acknowledged that there were strategic choices that "caused problems" and that they had to "train [the] police force differently." (*People*, Am. Compl., ¶110.) Though Commissioner Shea may have said that practicing de-escalation was tough when bricks were being thrown at officers,

---

[25] That has yet to be proven. Because, of course, according to the Supreme Court, not every push or shove is the basis for a constitutional violation. *Graham v. Connor*, 490 U.S. 386, 396-97, (1989) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.") (cleaned up).

[26] Plaintiffs broadly claim that "[d]efendants knew that NYPD Officers would confront demonstrations protesting police brutality . . . . . Nevertheless, Defendants knowingly deployed thousands of insufficiently trained and supervised NYPD Officers to police the Protests." (*People*, Am. Compl., ¶82.) There are no factual allegations supporting the contention that officers violated protesters' rights in anti-police protests.

the context must be considered. He was acknowledging that officers—who are human beings, though plaintiffs attempt to villainize the entire NYPD into a nameless, faceless feral blue swarm—had been working in challenging conditions. That is not a cry to arms as plaintiffs imply.[27] (*Payne*, Am. Compl., ¶46, 49.) Moreover, the Chief of Patrol denounced bad acts. (*People*, Am. Compl., ¶¶83-85 "that's not in alignment with what we stand for as agency.") In one of the instances of force that plaintiffs identify, the officer who protester Dounya Zayer alleges shoved her is being criminally prosecuted for his actions. (*People*, Am. Compl., ¶¶216, 218.) A criminal prosecution is far from ratification. There is no tolerance for excessive force.

Finally, that officers may have not been disciplined for the use of force at protests from the summer is of no moment. (*People*, Am. Compl., ¶¶37-38.) Not all disciplinary decisions have been made yet. *See e.g.* ECF No. 34 at 2. This claim fails.

> b. Plaintiffs Fail to Point to a Practice of Interfering with the Rights of the Public to Observe and Report Upon Police Behavior.

Plaintiffs say that members of the NYPD interfered with the rights of the public to "gather, receive, record, and disseminate information and observe and report upon police behavior" and protesters' rights to "speech, expression, and peaceful assembly." (*People*, Am. Compl., ¶399-401.) Plaintiffs refer to three isolated incidents. (*People*, Am. Compl., ¶¶402-407; 408-421; 422-430.) Three incidents over the course of two months cannot form the basis for a practice so persistent and widespread by the City of New York or one that was ratified.

---

[27] Similarly, statements by Commissioner Shea such as "You look at the anti-police rhetoric, it disgusts me to my core" cannot be the basis for municipal liability. (*Payne*, Am. Compl., ¶57; *Sierra*, Am. Compl., ¶¶4, 7.) This statement does not incite violence. Moreover, objectively speaking, statements like "Fuck the Police" (FTP) and "All Cops Are Bastards" (ACB) are inherently anti-police. Broadly proclaiming, even if it is rhetorically, that all members of a certain profession are bastards is not un-offensive.

4. *No Failure to Train Municipal Employees Amounts to Deliberate Indifference.*

A "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* "First, the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation. Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (cleaned up). A plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004).

Whether the "facts demonstrate that the policymaker's inaction was the result of a conscious choice and not mere negligence" is the "operative inquiry." *Cash v. Cty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011). "[A] city's failure to train its subordinates satisfies the policy . . . requirement only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007).

a. Plaintiffs Fail to Establish a Failure to Train Officers in Policing Protests.

Plaintiffs claim that the City has failed to train its officer on how to handle protests. (*Payne*, Am. Compl. ¶¶44-65, 82-87; *People*, Am. Compl., ¶¶9-10; ¶¶31-32; *Sow*, Am. Compl.,

¶124; 430-462.) While plaintiffs may be pointing to a lack—or even an inadequacy—in training, that does not rise to the level of a failure to train. (*Sow*, Am. Compl., ¶113.)  It cannot be said any purported inaction was the result of a conscious choice, which is the operative inquiry.

Plaintiffs cannot say that defendants knew to a moral certainty that members of the NYPD would confront unprecedented anti-police protests in the middle of a pandemic. Bombastically, plaintiffs proclaim that defendants knew to a moral certainty that "NYPD officers would confront protesters marching against police brutality; that officers would respond with violence . . . that officers would conduct mass arrests of protestors; and that officers would deliberately refuse to wear masks in violation of state law."  (*Payne*, Am. Compl., ¶87). How could anyone know—and know to a moral certainty, no less—that officers would be mandated to wear masks in the midst of a once-in-a-hundred-year pandemic when confronting unprecedented protests? None of the cases plaintiffs cite to concern policing unplanned protests in a pandemic when violence is directed to the police. So these allegations cannot form the basis for liability.

But no matter. Plaintiffs cannot meet the second prong either. They also cannot plausibly allege that there is a history of police officers mishandling protests in a pandemic. There has not been an epidemic in the City of New York for nearly a hundred years. And there are no allegations about policing protests in the 1900s in the Complaint. Even if plaintiffs want to manipulate the facts and take the pandemic out of the equation, there is no history of mishandling protests. Although there was a liability verdict in one case arising out of the RNC and many complaints were filed after OWS, this does not mean protests have been mishandled. RNC and OWS differ from the protests here. Those were essentially planned, organized protests. The protests here were generally unplanned. There is no indication that NYPD has a history of mishandling unplanned protests. And when the public in the form of juries and judges—not

academics; not civil liberties or human rights groups with vested interests; not the CCRB, which does not asses according to constitutional standards—confront these types of cases they consistently find no constitutional violation. *See* footnote 2. That is not a history of mishandling.

Finally, plaintiff cannot meet the third prong of a failure to train claim either. This requires plaintiffs to plausibly allege that a wrong choice by a police officer will frequently cause deprivation a citizen's constitutional rights. Pandemic or not, in the past decade there has only been one case where a jury found that one member of service violated one protester-plaintiff's constitutional rights and awarded him in damages of one penny. That does not amount to a history of constitutional violations arising from protests. Thus, plaintiffs cannot say the wrong choice by officers frequently deprives citizens of their constitutional rights.

      b.  Plaintiffs Fail to Establish a Failure to Train Concerning COVID-19 Protocols; the Curfew Order; or Covering Badges.

Plaintiffs allege that the City failed to train police officers "to wear masks during the COVID-19 pandemic, to provide masks for arrestees, and to allow arrestees to engage in mask-wearing, social distancing, handwashing, and other, similar safety measures in light of the COVID-19 pandemic." (*Sow*, Am. Compl., ¶439(g).) Plaintiffs also claim that the City failed to train its officers on "the need for fair warning and a meaningful opportunity to comply with police directions as a prerequisite for probable cause to arrest for a Curfew Order violation." (*Sow*, Am. Compl., ¶438(c).) Finally, plaintiffs claim that the City failed to take actions to stop officers from covering their badges. (*Payne*, Am. Compl.,¶226.)  These claims—which concern the global pandemic— are bogus. As stated *supra*, there is no way that the City could have known its police officers would confront huge protests amidst a deadly pandemic during which a once in a century curfew was implemented—and certainly not to a moral certainty. Therefore, there can be no failure to train on this issue.

21

5. *No Boilerplate Claims For Municipal Liability Should Proceed.*

Certain *Monell* claims must be dismissed as boilerplate. (*See Sierra*, Am. Compl.,¶¶191-194; *Yates*, Compl., ¶¶22-24, 31-32l.) The "mere assertion, however, that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993) (citations omitted). Here, plaintiffs' threadbare recitals do not suffice. As there are no allegations supporting the inference of a municipal policy or custom, plaintiff has not adequately pleaded municipal liability. Thus, the boilerplate *Monell* claims must be dismissed.

**B. *Plaintiffs' Claims against de Blasio, Shea, and Monahan are Redundant.***

Suing defendants in their official capacities "adds nothing." *Davis v. Stratton*, 360 F. App'x 182, 183 (2d Cir. 2010). Any claim against the Mayor, Commissioner, and Chief in their official capacities is duplicative of plaintiffs' claims against the City of New York. This is because a "suit against a governmental officer in [their] official capacity is the same as a suit against the entity of which the officer is an agent." *McMillian v. Monroe Cty.*, 520 U.S. 781, 785 n.2 (1997) (cleaned up). When "a plaintiff names both the municipal entity and an official in [their] official capacity, district courts have consistently dismissed the official capacity claims as redundant." *Phillips v. Cty. of Orange*, 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012) (citing cases). Thus, the Court should dismiss the claims against defendants in their official capacities.

**C. *Plaintiffs Fail to Plead Any Supervisory Liability Claim.***

Plaintiffs sue under a theory of supervisory liability. (*Wood*, Am. Compl., ¶¶204-215; *People*, Am. Compl., ¶¶294, 296.). "Simply put, there's no special rule of liability for supervisors. The test for them is the same as the test for everyone else." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Because plaintiffs fail to "directly plead and prove" that

Mayor de Blasio, Commissioner Shea, and Chief Monahan "through the [their] own individual actions, ha[ve] violated the Constitution, this claim cannot proceed. *Id.* at 612. Indeed, standing "laughing" at a protest does not impute liability. (*People*, Am. Compl., ¶295.) This claim fails.

Similarly, plaintiffs bring a barrage of allegations not directed at any defendant. These allegations include saying that legal observers, medics, and other curfew-exempt essential workers should not have been arrested at these protests. (*People*, Am. Compl., ¶¶276-323.) There is no allegation that Mayor de Blasio, Commissioner Shea, or Chief Monahan were personally involved in any of these instances. Thus, liability cannot be imputed against them.

## III.   Qualified Immunity Shields Defendants from Liability.[28]

The doctrine of qualified immunity shields defendants Mayor de Blasio, Commissioner Shea, and Chief Monahan from liability for any claims for money damages.

"Public officials are entitled to qualified immunity unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). "Clearly established means that, at the time of the [official's] conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* (quotations omitted). Plaintiffs must show with a high degree of specificity that the rule they seek to apply prohibited the official's conduct. *Id.* at *186-7 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015)).  Unless any reasonable official would have known for certain that the conduct at issue was unlawful under the then-existing precedent, an official is immune. *Id.* at *187 (citing *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017)).

---

[28] Defendants reserve the right to raise any qualified immunity defense on summary judgment, particularly for the individually named officers.

Here, at most, plaintiffs appear to be suing the Mayor in his individual capacity for issuing Ex. Order No. 117.[29] (*Payne*, Am. Compl., ¶¶51; *People*, Am. Compl. ¶¶262-292; *Sow*, Am. Compl., ¶¶72-77.) He is entitled to qualified immunity for issuing that order.[30] The Commissioner and Chief are entitled to qualified immunity for claims related to enforcement.

The Mayor issued the curfew order "to protect the City and its residents from severe endangerment and harm to their health, safety and property," the spreading of the virus and also the "demonstration activities [that] were subsequently escalated, by some persons, to include actions of assault, vandalism, property damage, and/or looting." (Ex. F, Exec. Order 117.)

First, plaintiffs cannot show the violation of a federal right. A "community has the right to protect itself against [a pandemic] which threatens its members[.]" *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 31 (1905). Courts have "uniformly found that the restrictions were adopted for the undeniable public interest in fighting COVID-19 which . . . has only become more apparent since the cases were decided." *Geller v. Cuomo*, 476 F. Supp. 3d 1, 15 (S.D.N.Y. 2020) (citing cases).  There is no question that the curfew order was narrowly tailored and content neutral. *See e.g. Geller v. De Blasio*, No. 20 Civ. 3566 (DLC), 2020 U.S. Dist. LEXIS 87405 (S.D.N.Y. May 18, 2020). Unlike in *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63 (2020), the curfew here did not apply to one type of activity, such as religious services at houses of worship. The curfew order here also served a significant government interest: safety.

---

[29] The allegations against the Mayor, Commissioner, and Chief in their official capacity are redundant to plaintiffs' claims for municipal liability. Qualified immunity is not a shield that the municipality enjoys. *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014).

[30] *Jeffreys v. City of New York, et al.*, 20-cv-2843 (NGG) (EDNY) deals explicitly with the constitutionality of the curfew and qualified immunity.  Defendants incorporate all of the City's arguments there herein. (ECF No. 20.)

Assuming *arguendo* that the imposition of this curfew violated plaintiffs' constitutional rights (it did not), any unlawfulness was not clearly established. *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808 (2009). This is because there was no clearly established law in June 2020 saying a mayor could not impose a curfew during a pandemic to protect the city residents from danger to their health and safety and to deal with assault, vandalism, and looting.[31]  Importantly, even if *Roman Catholic Diocese* can be read broadly—and the Supreme Court has cautioned against generalizations when determining qualified immunity—to say that a curfew should not have been imposed in this specific instance, because *Roman Catholic Diocese* was not decided until well after the curfew was implemented, it cannot form the basis for clearly established law. Indeed, the law of the land at the time the curfew was imposed supported its constitutionality. *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613-14 (2020).

Furthermore, even if the curfew did violate a clearly established law, defendants' actions were objectively reasonable. "An officer is entitled to qualified immunity if any reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, could have determined that the challenged action was lawful." *Muschette v. Gionfriddo*, 910 F.3d 65, 70 (2d Cir. 2018). Elected officials throughout the country—if not the whole world—grappled with how to deal with the spread of COVID-19 in 2020. Officials could have determined that imposing and enforcing a curfew during a pandemic was lawful. Thus, defendants are entitled to qualified immunity.

---

[31] Of course, "*Jacobson* didn't seek to depart from normal legal rules during a pandemic, and it supplies no precedent for doing so." *Roman Catholic Diocese*, 141 S. Ct. at 70.

## CONCLUSION

For the foregoing reasons, defendants City of New York, Mayor Bill de Blasio, Commissioner Dermot Shea, and Chief Terence Monahan respectfully request that the Court grant their motion pursuant to Rule 12(b)(1)  and Rule 12(b)(6) of the Federal Rules of Civil Procedure and dismiss all of the aforementioned claims with prejudice, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
      March 26, 2021

**GEORGIA M. PESTANA**
ACTING CORPORATION COUNSEL OF THE CITY OF NEW YORK
*Attorneys for Defendants*
100 Church Street
New York, New York 10007
(212) 356-3523

By: _____
       Brachah Goykadosh
       Elissa B. Jacobs
       Dara L. Weiss
       *Senior Counsels*
       Special Federal Litigation Division